

RECEIVED
IN MONROE, LA.



MAR 0 8 2011

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| WANDA SMITH | CIVIL ACTION NO. 09-0168 |
| VERSUS | JUDGE ROBERT G. JAMES |
| JP MORGAN CHASE, ET AL. | MAG. JUDGE KAREN L. HAYES |

### RULING

Pending before the Court are a Motion for Summary Judgment [Doc. No. 25], a Motion to Strike [Doc. No. 44], and a Motion in Limine [Doc. No. 53] filed by Defendant J.P. Morgan Chase Bank, NA ("Chase") and a Motion to Strike [Doc. No. 49] filed by Plaintiff Wanda Smith ("Smith"). For the following reasons, Chase's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, Chase's Motion to Strike is DENIED, Chase's Motion in Limine is GRANTED, and Smith's Motion to Strike is DENIED.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This employment discrimination case arises out of Chase's alleged failure to accommodate Smith's hearing impairment[1] and its subsequent termination of her employment.

Smith began working for one of Chase's predecessors in 1986 in the home equity department. In October 2005, Chase relocated the home equity department to another city. Smith and other employees were transferred to the lien release department in Monroe, Louisiana. Smith began

---

[1]Smith uses prescriptive hearing aids, but alleges that the hearing aids do "not significantly increase her hearing to the point of being self[-]sufficient. Even with the hearing aid, her hearing is still significantly below that of a typical adult." [Doc. No. 40-1]. Smith does not understand sign language, but has some ability to "lip-read."

working in the position of "Senior Lead Operations Specialist," also called a lien release processor. Upon arrival in the lien release department, Smith received two to three weeks of group classroom training. Smith avers that she did not understand the training because she could not hear the instructor, and, "[i]n a traditional class room setting, [she is] unable to lip read an instructor who is constantly moving or directing his speech to different persons in the audience during a lecture." [Doc. No. 40-2].

Smith used a computer to process lien releases from all 50 states and was required to comply with each state's lien release requirements, which were compiled on Smith's computer and printed and kept at her desk. Smith alleges that changes to each state's lien release requirements "might not be changed for a month" and that "[e]ach processor was notified of the changes verbally in an office meeting," which Smith was unable to understand because of her hearing impairment. [Doc. No. 40-1]. At Smith's request, her supervisor, Ramon Lusk ("Lusk") sometimes provided the new lien release requirements to her in written format, but she alleges that Lusk did not do so consistently.

Chase had a system for recording a lien release processor's productivity and quality of work or accuracy in complying with lien release requirements. Each processor used a program to record the quantity of lien releases processed per hour. Chase also had a system for grading the accuracy or "quality" of each lien release processed. Chase graded lien release processor as "productive" if her lien releases processed per hour equaled or exceeded a benchmark number. Chase graded a lien release processor as meeting the quality standard with an accuracy percentage of 95% to 98% and exceeding the quality standard with an accuracy percentage of 98% or greater.

On February 1, 2006, Smith met with Lusk to review the productivity and quality of her work. Smith indicated to Lusk that she needed more training on the requirements of certain states.

2

Smith requested one-on-one training "to have someone there to go over the guidelines and show [her] on the system what needed to be done and how to work- how to work the files and explain a little more detail the state guidelines." [Doc. No. 25-2]. Smith avers that, because she can lip-read, "if [she had] one-on-one training then [she could] comprehend the training and understand changes." [Doc. No. 40-2]. In response to Smith's request, on February 6, 2006, Chase began assigning Smith "only . . . less detailed states." *Id.* On February 15, 2006, Smith gave written notification to Chase that she did not receive one-on-one training.

That same month, Shirley Harris ("Harris"), a supervisor for other lien release processors, suggested to Smith that she should transfer to a vacant file-intake job as an accommodation for her hearing loss. Harris allegedly contacted Dennis Ward ("Ward"), who would later become the lien release department manager, but the job transfer was denied. Chase admits that there was a file intake vacancy posted online on January 10, 2006; that the vacancy was filled by DeAndrea Chapman, a non-employee who applied online for the vacancy on January 16, 2006; but states that Smith did not apply for the job online or in writing.

On March 7, 2006, Smith began attending group training sessions related to processing lien releases. The parties dispute whether Chase provided one-on-one training to Smith in addition to the group training sessions, but, for purposes of its Motion for Summary Judgment, Chase assumes that Smith did not receive one-on-one training. In April 2006, Ward became the lien release department manager and resumed Chase's earlier practice of assigning Smith lien releases for all 50 states.

In April 2006, the productivity benchmark was set at 13.34 lien releases processed per hour. On September 9, 2006, in a one-on-one discussion with Smith, Lusk stated that Smith

3

"needed to effectively work on her time management skills in order to increase her production and decrease the number of errors made in order to increase her quality score." [Doc. No. 25-1].

In an October 2006 appraisal of Smith, Lusk wrote that he "would like to see [Smith] become more knowledgeable of the state regulations. This will allow her to increase her speed and production." [Doc. No. 40-2].

On January 9, 2007, Smith was warned that if she did not meet the quantity benchmark, she would receive a written warning. Smith avers that, from January 2007 to July 2007, she repeatedly requested one-on-one training, which Ward denied, and that Lusk and Ward told her not to bother co-workers with questions.

On February 1, 2007, Smith told Lusk and another employee that she increased her productivity by no longer double checking her work, by working on more difficult lien releases first, by "adding her copy time to the production sheet," and by working through her lunch break "off-the-clock." Lusk told Smith that processing lien releases without recording the time as productive time and working off-the-clock were against company policy and not permitted.

On February 9, 2007, Smith received a written warning for failing to process at least 13.34 lien releases per hour in any month between April 2006 and January 2007. The warning stated that if "production does not progress to the stated target (avg. 100 satisfaction = 13.34 completed per hour w/2% - 5% error), the next step in corrective action will be taken up to and including recommendation for termination." [Doc. No. 25-1].

In July 2007, Chase changed the productivity benchmark to 11.33 lien releases processed per hour.

From February 2006 to July 2007, Smith's monthly productivity and quality statistics were

4

as follows:

| Month | Productivity | Quality |
|---|---|---|
| | (Releases processed per hour) | (Accuracy percentage) |
| February 2006 | 58 (files per day) | No Data |
| March 2006 | 77 (files per day) | No Data |
| April 2006 | 68.9 (files per day) | No Data |
| May 2006 | 8.67 | 100 |
| June 2006 | 8.59 | 97 |
| July 2006 | 8.77 | 98 |
| August 2006 | 9.35 | 97 |
| September 2006 | 6.82 | 100 |
| October 2006[2] | 6.32 | 50 |
| November 2006 | 7.14 | 64 |
| December 2006 | 10.47 | 100 |
| January 2007 | 12.767 | 78 |
| February 2007 | 14.03 | 100 |
| March 2007 | 13.67 | 99.93 |
| April 2007 | 11.34 | 99.64 |
| May 2007 | 8.47 | 99.55 |
| June 2007 | 8.90 | 98.74 |
| July 2007 | 11.15 | 97.72 |

On August 1, 2007, Lusk, with the approval of Ward, fired Smith for failing to meet the productivity benchmark in multiple months. Sometime thereafter, the lien release department was transferred to the Philippines.

Initially, Smith drew unemployment benefits, and, as a result, she was required to apply for a certain number of jobs through the Louisiana Workforce Commission. Smith became a "self-employed sitter through the State of Louisiana" and also worked for her husband as a bookkeeper. [Doc. No. 40-1].

On January 30, 2009, Smith filed suit in this Court. Smith alleged claims under the

---

[2]From October 16 to November 27, 2006, Smith took leave under the Family Medical Leave Act.

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Louisiana
Employment Discrimination Law ("LEDL"), La. Rev. Stat. § 23:323(B), Louisiana's statutory
parallel to the ADA,[3] for failing to provide a reasonable accommodation or engage in a good faith
interactive process, for discharging her because of her hearing impairment, and for retaliating against
her because of her accommodation requests.   Smith also alleged claims under the Fair Labor
Standards Act ("FLSA"), 28 U.S.C. §§ 201-219, for unpaid wages and unpaid overtime and,
pursuant to 42 U.S.C. § 1981a, for punitive damages.  Finally, Smith alleged that she was entitled
to compensatory damages, including front and back pay and attorney's fees.

On December 13, 2010, Chase filed a Motion for Summary Judgment, asserting that all of
Smith's claims should be dismissed with prejudice. [Doc. No. 25]. Chase asserts that Smith's FLSA
claims should be dismissed because "Chase did not suffer or permit off-the-clock work from
Smith."[4]  Chase asserts that Smith's ADA claims should be dismissed because Smith "was not
qualified to do the job of lien release processor with or without accommodation," "Plaintiff's
requested accommodation of additional training is not causally related to her failure to meet the
productivity levels essential to the function of lien release processor," and "Plaintiff cannot establish
that she requested a job transfer to a vacant position as an accommodation." [Doc. No. 25-8]. Chase
also asserts that, even assuming Smith is covered under the ADA, she "cannot meet her burden of
proving that the legitimate, nondiscriminatory reason for termination - failure to meet her
productivity goals for the months of April through July 2007 - was pretext for a real discriminatory

---

[3]In this Ruling, the Court's analysis and conclusions as to Smith's ADA claims also apply
to her LEDL claims.

[4]In her Response to Chase's Motion for Summary Judgment, Smith abandons her FLSA
claims.

purpose." *Id.* Finally, Chase asserts that Smith is not entitled to punitive damages and is not entitled to front pay and back pay after June 2009, because she failed to mitigate her damages.

On February 2, 2011, Chase filed a Motion to Strike [Doc. No. 44], asserting that a January 19, 2010 email sent to Smith from "careerbuilder.com" [Doc. No. 40-2, Exhibit F] and a November 15, 2006 Family Medical Leave Act ("FMLA") application [Doc. No. 40-2, Exhibit O] should not be considered by this Court in ruling on Chase's Motion for Summary Judgment.

On February 9, 2011, Smith filed a Motion to Strike [Doc. No. 49], asserting that 10 pages of newspaper classified ads [Doc. No. 48-1, Exhibit G] should not be considered by this Court in ruling on Chase's Motion for Summary Judgment.

On February 10, 2011, Chase filed a Motion in Limine [Doc. No. 51] seeking "to limit the use of or exclude medical records of Joel Norris, M.D., and Lawrence Danna, M.D., treating physicians, to establish the degree of Plaintiff's hearing loss and the limitations caused by such loss." [Doc. No. 51, p. 1].

On February 11, 2011, Chase filed two more Motions in Limine [Doc. Nos. 53 & 57] seeking "to exclude evidence at trial and argument to the jury that Plaintiff lost wages after June 2009," "Exhibits 1016 and 1017," a "work life expectancy table," a webpage from "tradingeconomics.com," and the testimony of Ronald Lawrence.

On the same day, Smith filed two Motions in Limine [Doc. Nos. 54 & 58] seeking to exclude "104 newspaper advertisements published in the *Monroe News Star* from January 6, 2008, to October 10, 2010," and "evidence of company policy restricting transfers," and to instruct Chase to inform its witnesses not to testify about evidence of company policy restricting transfers.

7

## II.    LAW AND ANALYSIS

### A.    Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B.    ADA Claims

#### 1.    Qualified Individual

Chase asserts that Smith could not perform the essential function of a lien release processor

of processing lien releases "promptly" with or without reasonable accommodation,[5] and, therefore,

she was not a qualified individual within the meaning of the ADA.

> The ADA prohibits employers from
>
> discriminat[ing] against a qualified individual with a disability because of the
> disability of such individual in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee compensation, job training, and
> other terms and conditions, and privileges of employment.

42 U.S.C. § 12112(a).

To be a qualified individual, a claimant must be "an individual with a disability who satisfies

the requisite skill, experience, education and other job-related requirements of the employment

position such individual holds or desires, and who, with or without reasonable accommodation, can

perform the essential functions of such position." 29 C.F.R. §1630.2(m); *see also* 42 U.S.C.

§12111(8). Essential functions are "those functions that the individual who holds the position must

be able to perform unaided or with the assistance of a reasonable accommodation." § 1630.2(n). A

"reasonable accommodation" is, among other things:

> (ii) [a] [m]odification[] or adjustment[] to the work environment, or to the manner
> or circumstances under which the position is held or desired is customarily
> performed, that enable a qualified individual with a disability to perform the essential
> functions of that position; or (iii) [a] [m]odification[] or adjustment[] that enable a
> covered entity's employee with a disability to enjoy equal benefits and privileges of
> employment as are enjoyed by its other similarly situated employees without
> disabilities.

§1630.2(o)(1). A reasonable accommodation "may include but is not limited to: . . . (ii) [j]ob

---

[5]At least for purposes of summary judgment, the parties do not dispute that processing
lien releases promptly is an essential function of a lien release processor. The parties also do not
dispute that Smith had the requisite skill, experience, education, and other job-related
requirements for a lien release processor. Smith had a college degree in Computer Information
Systems and worked at Chase or its predecessors for over 20 years without any disciplinary
history until she was transferred to the lien release department.

9

restructuring; part time or modified work schedules; reassignment to a vacant position; . . . appropriate adjustment or modifications of examinations, training materials or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities." §1630.2(o)(2). A qualified individual

> is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.

§ 1630.9(d).

Smith avers that she did not understand the instructor in the group training sessions or the information verbally conveyed in office meetings because of her hearing impairment. Smith also avers that she would have been able to process lien releases promptly if she was given the reasonable accommodations of one-on-one training and by being consistently provided with written new lien release requirements. Lusk testified that training was important and could have an effect on an employee's performance. In the October 2006 appraisal of Smith, Lusk wrote that if Smith became more knowledgeable of lien release requirements, she would increase her "speed and production." [Doc. No. 40-2]. Together, this evidence is enough to create a genuine issue of material fact as to whether Smith could process lien releases promptly if she were given the type of reasonable accommodations she requested.

Chase argues that Smith's requested accommodation of one-on-one training was not reasonable because it would not have increased her productivity numbers and that she "ignor[ed] her productivity issues by not following up on Chase's request that she take paper courses on time

10

management." [Doc. No. 48]. However, based on the evidence submitted at this stage in the proceeding and as previously discussed, one could reasonably conclude that Smith's "productivity issues" were not caused by her poor time-management skills, but by her inability to understand the group training sessions and new lien release requirements announced orally at office meetings. The fact that Smith consistently met or exceeded Chase's accuracy or quality standards, understood terms and concepts used on the job, "could and did read the state regulation book[,] and asked coworkers for information and tips," does not alter the Court's conclusion. Smith avers that, because she could not hear or adequately lip-read during group classroom training sessions and informal office meetings, she "had to do [her] work slower to be accurate due to the constant looking up of information and consulting with co-workers." [Doc. No. 40-2]. Based on this evidence, a reasonable juror could conclude that Smith did not process lien releases promptly because of a lack of reasonable accommodations.

Chase argues that Smith's time spent self-training was not factored into her productivity statistics. Specifically, Chase notes that:

> A processor kept track of her own time, dividing it between production and non production time. Chase Exh. D, Deposition of Wanda Smith dated 8/27/2010, pp. 97, 99, 100; Chase Exh. E, Deposition of Ramon Lusk, p. 48. Production time is the time she spent on each function done to process a file, including copying legal descriptions. Chase Exh. B, p. 187, l. 3-p190, p.18. Any other time is non-productive time and she identified how it was spent. Self-training was non-productive time not used to quantify productivity. Id. at p.189, ll. 9-p. 190, l. 6. Self-training was non-productive time not used to quantify productivity speed. Id. at p. 187, l. 10-19.

[Doc. No. 48]. Therefore, any time Smith spent "looking up information and consulting with co-workers" did not affect the average number of releases processed per hour. [Doc. No. 40-2].

For these propositions, Chase cites the deposition testimony of Lusk and Smith. Lusk

testified that the productivity statistics come from "[m]onthly productivity reports where the employee is responsible for entering in their time on productivity as well as their daily productivity number." [Doc. No. 25-5]. Smith testified that productivity statistics were calculated by "key[ing] in the number of hours that you worked that day" and "input[ting] your breaks and your lunch in." [Doc. No. 25-4]. Neither person stated that self-training was non-productive time or that Smith's time spent self-training did not affect her productivity statistics.

Chase also argues that Smith could not process lien releases promptly even though it provided Smith with a reasonable accommodation when it gave her written lien release requirements. *See E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) ("The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation."); 29 C.F.R. § 1630.9 ("The accommodation, however, does not have to be the 'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated . . . . [T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide."). Specifically, Chase argues that, because Smith could "comprehend, understand, [and] absorb what she read," Chase provided her a reasonable accommodation in the form of a "one and one-half inch book of all state, county and parish regulations with all of the information that she needed to process every release, excluding any later changes." [Doc. No. 48]. However, as previously noted, Smith avers that she used the written lien release requirements, but that it lowered her productivity statistics because she was constantly looking up information. Smith also avers that the new lien release requirements that were announced orally at office meetings were not consistently provided to her in writing. Additionally, Chase does not offer evidence that it gave

12

Smith nonproductive time to learn the written lien release requirements. In that sense, there remains a genuine issue of material fact as to whether Chase's alleged inconsistent practice of providing Smith with written lien release requirements without nonproductive time to study those requirements was a reasonable accommodation for Smith's hearing impairment. Therefore, the Court finds that there remains a genuine issue of material fact as to whether Smith was a qualified individual as defined by the ADA.

### 2. Discrimination for Failing to Accommodate

Chase asserts that a reasonable accommodation did not exist that would have enabled Smith to process lien releases promptly and that it did not fail to provide reasonable accommodations. Chase also asserts that Smith cannot show that Chase failed to engage in a good faith interactive process.

To establish a claim of discrimination for failing to accommodate, Smith must show that (1) she had a disability; (2) she was qualified for the job; (3) Chase knew of the disability; (4) she requested an accommodation; (5) a reasonable accommodation existed that would have allowed her to perform the essential functions of the job; and (6) Chase failed to provide a reasonable accommodation. 42 U.S.C. § 12112(b)(5)(A); *Riel v. EDS Corp.*, 99 F.3d 678, 683 (5th Cir. 1997). "When no reasonable accommodation can be made to the plaintiff's prior job, he may be transferred to another position." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (citation omitted). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Id.* (citation omitted).

Once an employee makes a request for reasonable accommodations, the employer is obligated by law to engage in an "interactive process" or "a meaningful dialogue with the employee

13

to find the best means of accommodating that disability." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009) (internal quotation marks and citation omitted). "When an employer does not engage in a good faith interactive process, that employer violates the ADA." *Id.*

For purposes of its Motion for Summary Judgment, Chase does not dispute that Smith had a disability, that Chase knew of that disability, that Smith requested accommodations of one-on-one training, or that Smith requested accommodations of being consistently provided new lien release requirements that were announced orally at office meetings in writing. The Court has already found that genuine issues of material fact exist as to whether a reasonable accommodation in the form of one-on-one training would have enabled Smith to process lien releases promptly and whether Chase's practice of inconsistently providing Smith with written lien release requirements without nonproductive time to study those requirements was a reasonable accommodation for her hearing impairment. Therefore, there remains a genuine issue of material fact as to whether Chase discriminated against Smith by denying her the accommodations requested.

There also remains a genuine issue of material fact as to whether Chase breached a duty to accommodate Smith when she was denied a job transfer. Smith submits evidence of 24 vacant Chase positions involving clerical work from March 2, 2006, to March 6, 2007.[6] Smith testified that Harris indicated, and Smith showed interest in, a vacant file-intake position in February or March

---

[6]Chase fails to cite an authority for the proposition that it had no duty to accommodate Smith through a job transfer because she only orally requested or showed interest in such a transfer. *See Liner v. Hosp. Serv. Dist. No. 1 of Jefferson Parish*, 230 Fed. App'x 361, 364, 2007 WL 1111565 (5th Cir. April 10, 2007) (Jury was entitled to find that employer did not make a good faith effort to reasonably accommodate employee when, instead of working with the employee to identify a vacant position within the company that he might be able to transfer to, the employer terminated him and told him it was his responsibility to find another job within the company.).

14

2006. It is unclear whether the file-intake position was filled prior to Smith and Harris' conversation. Therefore, assuming Smith's inability to process lien releases promptly was caused by her hearing impairment, there remains a genuine issue of material fact as to whether an available position existed that Smith was qualified for and could, with reasonable accommodations, perform.

Finally, there remains a genuine issue of material fact as to whether Chase breached a duty to engage in a good-faith interactive process. The evidence shows that Smith repeatedly requested one-on-one training and that Chase repeatedly denied or ignored her requests. While Chase did assign less detailed states to Smith in February and March 2006, that practice ended in April 2006, when Ward became Smith's supervisor. There is no evidence that after April 2006, Chase made any attempt to engage with Smith in a good faith interactive process.

Chase argues that it did not know that Smith's inability to process lien releases promptly was caused by inadequate training. Specifically, Chase argues that it relied on Smith's quality statistics to conclude objectively that she did not need further training. However, Smith has presented evidence that Chase did know that her inability to process lien releases promptly was caused by inadequate training. For example, in the October 2006 appraisal of Smith, Lusk wrote that he "would like to see [Smith] become more knowledgeable of the state regulations. This will allow her to increase her speed and production." [Doc. No. 40-2].

There remains a genuine issue of material fact as to whether Chase breached its duty under the ADA to engage in a good faith interactive process with Smith.

### 3. Discriminatory Discharge

Chase asserts that Smith's discrimination claim fails because she cannot show that she was fired because of her hearing impairment.

15

To establish a claim of discriminatory discharge based, Smith must show that she (1) had a disability, (2) was qualified for the job, and (3) was discharged because of her disability.[7] *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999) (citing *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)).

Chase submits that Smith was discharged because she could not process lien releases promptly. However, if Smith's inability to process lien releases promptly was caused by her hearing impairment, then Smith was discharged because of her disability. *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001) (With exception of alcoholism and illegal drug use, "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination.") (citing *Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997) ("The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability.")). The Court has already found that there remains a genuine issue of material fact as to whether a reasonable accommodation would have enabled Smith to process lien releases promptly. Therefore, there also remains a genuine issue of material fact as to whether Smith was discharged because of her hearing impairment.

---

[7]The parties analyze Smith's discriminatory discharge claim primarily based on a burden-shifting analysis that applies to claims based on indirect evidence. *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995). However, because Smith does not dispute that Chase's reason for discharging her is true, this case does not easily fit within such an analysis. Regardless, even if the Court used the burden-shifting analysis, its conclusions would be the same. The additional elements in the burden-shifting analysis are subsumed by the overarching question of whether Smith was discharged because of her hearing impairment.

16

#### 4.   Retaliation

Chase asserts that there is no causal link between Smith's requests for accommodations and her discharge. The Court need not address whether a causal link exists because, as Chase also asserts, even if Smith can establish a *prima facie* case, she has not produced evidence that Chase's legitimate, non-retaliatory reason for her firing was pretextual.

To establish a *prima facie* claim of retaliation, a plaintiff must show that "(1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (citation omitted). A protected activity includes "oppos[ing] any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a). Once the employee establishes a claim of retaliation, the burden of production shifts to the employer, who must show a legitimate, non-retaliatory reason for its action. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). The burden then shifts back to the employee "to establish that the employer's permissible reason is actually a pretext for retaliation." *Septimus v. Univ. of Houston*, 399 F.3d 601, 607 (5th Cir. 2005).

Smith simply states that, "[t]o succeed in her retaliation claim, a Plaintiff need not show that retaliation is the only reason for discharge." [Doc. No. 40 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996)]. While Smith's statement of the law may or may not be correct, she brings forth no evidence that Chase's reason for her discharge was pretextual or that her request for reasonable accommodations was a motivating factor in Chase's decision to discharge her. *See Brackens v. Dallas Indep. Sch. Dist.*, 2010 WL 5464823, at *20 n.18 (N.D. Tex. Sept. 20, 2010) ("[T]he Fifth Circuit has not directly addressed the question of whether the mixed-motives

17

framework applies in the ADA context.") (citing *Crouch v. J.C. Penney Corp.,* Inc., 337 F.App'x

399, 402 n.1 (5th Cir. 2009)); *Villalon v. Del Mar Coll. Dist.*, 2010 WL 3221789, at *3 (S.D. Tex.

Aug. 13, 2010) ("Although Plaintiff argues that the 'mixed-motive' framework is applicable to her

ADA retaliation claims . . ., the Fifth Circuit has applied the more general *McDonnell-Douglas*

framework without a mixed-motives analysis in ADA retaliation claims."). In Smith's analysis of

the adverse employment action element of her retaliation claim, she cites Lawrence's affidavit for

the proposition that Smith was fired because "she was faking her disability and was requesting an

accommodation." [Doc. No. 40]. However, a review of Lawrence's affidavit does not support such

a proposition. Lawrence averred:

> Ward said [Smith] was incompetent and didn't know what she was doing. He stated
> as long as she had been working there she should know what she was doing.
> LAWRENCE told Ward taht [sic] he knew Wnda [sic] Smith and told him taht [sic]
> she was hearing impaired. He said nothing could be done, that they were
> downsizing. Ward got arrogant saying Smith wasn't understanding she didn't act
> like she could hear him.

[Doc. No. 40-3]. Nowhere in Lawrence's affidavit does he state or infer that Ward stated that Smith

was faking her hearing impairment or was being fired because she requested accommodations.

Because Smith presents no evidence that Chase's legitimate, non-retaliatory reason for Smith's

discharge was pretextual or that her request for reasonable accommodations was a motivating factor

in Chase's decision to discharge her, her retaliation claim is DISMISSED WITH PREJUDICE.

### 5.    Damages

#### a)    Compensatory and Punitive Damages

Chase asserts that Smith is not entitled to compensatory or punitive damages.

A plaintiff is not entitled to recover compensatory damages on a discrimination claim if the

employer "demonstrates good faith efforts, in consultation with [the employee], to identify and make a reasonable accommodation that would provide [the employee] with an equally effective opportunity and would not cause an undue hardship on the operation of the business." 42 U.S.C. § 1981a(a)(3).

A plaintiff may not recover punitive damages from a discrimination claim unless the plaintiff demonstrates that "the defendant acted 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 732 (5th Cir. 2007) (quoting 42 U.S.C. § 1981a). "The availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's egregious conduct." *Id.* (citation omitted). "The employer must at least discriminate in the face of a perceived risk that its actions will violate the ADA." *Id.* (internal quotation marks and citation omitted).

The Court has already found that there remains a genuine issue of material fact as to whether Chase failed to engage in a good faith interactive process. Therefore, Smith may seek compensatory damages based on her discrimination claims.

However, with regard to punitive damages, Smith fails to argue or provide any evidence that Chase acted with malice or with reckless indifference. Additionally, based on its own review of the record, the Court is unable to identify any evidence tending to show that Chase acted with malice or with reckless indifference. Therefore, Smith's claim for punitive damages is DISMISSED WITH PREJUDICE.

### b) Front and Back Pay

Chase asserts that Smith is not entitled to front pay or back pay after June 2009.

A plaintiff suing for front or back pay under the ADA has a duty to mitigate his damages by

using reasonable diligence to obtain substantially equivalent employment. *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1045 (5th Cir. 1998). The "employer has the burden of proving failure to mitigate." *Palasota v. Haggar Clothing, Co.*, 499 F.3d 474, 486 (5th Cir. 2007). The employer satisfies this burden by showing that substantially equivalent work was available and that the plaintiff did not exercise reasonable diligence to obtain this work. *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1993 (5th Cir. 1990). "Although the employer is normally required to prove that substantially equivalent work was available and that the former employee did not exercise reasonable diligence to obtain it, once the employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003) (internal quotation marks and citation omitted).

Chase submits the deposition testimony of Smith to show that Smith made no reasonable efforts to obtain substantially equivalent work after June 2009. Smith testified that she did not look for job opportunities in the mortgage banking business after June 2009 because she was "interested in owning [her] own daycare." [Doc. No. 25-4]. Smith now attempts to contradict her deposition testimony by averring that she "applied to Career Builders which is an online employment agency." [Doc. No. 41-2]. However, she does not specify the months in which she did so or aver that she applied to any job on the website. A January 19, 2010 email sent to Smith from "careerbuilder.com," submitted by Smith as Exhibit F, indicates that she has not logged onto the website since October 13, 2007. [Doc. No. 40-2]. Finally, while Smith avers that she "never stopped looking [for a job] completely," she does not indicate what methods she used to obtain work after June 2009, other than "appl[ying] to Career Builders." *Id.* at 12. Therefore, there is no genuine

20

issue of material fact that Smith failed to satisfy her statutory duty to mitigate her damages after June 2009.

Chase's Motion for Summary Judgment is GRANTED on Smith's claims for front pay and back pay after June 2009, and these claims are DISMISSED WITH PREJUDICE.

For the same reasons, Chase's Motion in Limine seeking to exclude "evidence at trial and argument to the jury that Plaintiff lost wages after June 2009" is GRANTED.

### C.    Motions to Strike

Despite considering the January 19, 2009 careerbuilder.com email as evidence, the Court found that Smith failed to mitigate her damages after June 2009. Also, because Smith did not use reasonable efforts after June 2009 to obtain work, the Court did not rely on ten pages of classified ads submitted by Chase as Exhibit G. [Doc. No. 48-1]. Finally, the Court did not rely on Smith's Exhibit O in this Ruling because Chase did not move for summary judgment on whether Smith has a disability within the meaning of the ADA. Therefore, Chase's Motion to Strike [Doc. No. 44] and Smith's Motion to Strike [Doc. No. 49] are DENIED AS MOOT.

### D.    FLSA Claims

In her Response to Chase's Motion for Summary Judgment, Smith indicates a desire to abandon her FLSA claims. Therefore, Smith's FLSA claims are DISMISSED WITH PREJUDICE.

## III.    CONCLUSION

For the foregoing reasons, Chase's Motion for Summary Judgment [Doc. No. 25] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED IN PART to the extent that Smith's FLSA claims, retaliation claim, claim for punitive damages, and claims for front pay and back pay after June 2009 are DISMISSED WITH PREJUDICE. The motion is DENIED IN

PART to the extent that Smith's claims for discrimination remain pending.

Chase's Motion to Strike [Doc. No. 44] and Smith's Motion to Strike [Doc. No. 49] are DENIED AS MOOT.

Chase's Motion in Limine [Doc. No. 53] seeking to exclude "evidence at trial and argument to the jury that Plaintiff lost wages after June 2009," is GRANTED.  The Court defers ruling on the parties' other Motions in Limine [Doc. Nos. 51, 54, 57, & 58] until those motions have been fully briefed.

MONROE, LOUISIANA, this ⟋8⟍ day of March, 2011.

ROBERT G. JAMES
UNITED STATES DISTRICT COURT